**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 23-CR-360-DLF** |
| v. | : | |
| | : | |
| LANCE WHITE, | : | |
| | : | |
| Defendant | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Lance White to three months' incarceration, 12 months of supervised release, 100 hours of community service, and $500 in restitution.

**I.     Introduction**

Defendant Lance White, 53 and a carpenter, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

White pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by White's (1) early entrance into the Capitol Building (within ten minutes of the initial breach), (2) assistance to other rioters in entering the Capitol Building through a broken window, (3) repeated entrance into the Capitol Building, and (4) attempt to conceal from law enforcement officials photographic evidence of his unlawful breach of the building.

The Court must also consider that White's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of White's crime support a sentence of three months' incarceration in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1.

### Defendant White's Role in the January 6, 2021 Attack on the Capitol

As another individual using a megaphone stated, "If you're scared of confrontation, do not move forward" and "This is our chance to show them how fucking serious we are," White advanced on the Capitol Building. *See* Sentencing Exhibit 1.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.



*Image 1:* Still Shot from Exhibit 1 at 1:55; White is circled in yellow in these images.



*Image 2*

At approximately 2:23 p.m., approximately ten minutes after the initial breach of the

Capitol Building at the Senate Wing Door ("SWD") on the Upper West Terrace, White climbed

3

through a broken window next to the SWD.  White was wearing a bright blue shirt, red hat, white ski goggles, and shorts with an American flag pattern.



*Image 3*

From approximately 2:23 p.m. to 2:26 p.m., White assisted other rioters in entering the Capitol Building through that same broken window by waving his arms to guide them in and holding objects, such as flags, for rioters while they climbed through the window.



*Image 4*

At approximately 2:26 p.m., police officers responded to the breach and attempted to seal off the area and prevent more rioters from entering the Capitol Building. White then left the building at approximately 2:26 p.m. At this point, White could have turned around and left the area. He chose not to.

Instead, White re-entered the Capitol Building through the Upper West Terrace Door at approximately 2:37 p.m. White walked through the Rotunda while taking photos with his cell phone. As the former House Parliamentarian, Thomas Wickham, has previously testified in other trials, the Rotunda is at the very center of the joint session process enshrined in law and required for the transfer of presidential power. *See* Transcript 1, *United States v. Minuta, et al.*, Case No. 22-cr-15, 12/19/22AM Tr. at 1849-51. The "Official Proceeding Montage" video exhibit the government has used in many January 6 trials, Sentencing Exhibit 2, illustrates with blue arrows how the Senate progresses through the Rotunda and into the House for the joint session. *See* Image 5 (screenshot of Sentencing Exhibit 2).

5



*Image 5*

Indeed, on the morning of January 6, 2021, the joint session initiated the day's process with staffers carrying the required paper ballots for the Electoral College Certification Vote from the Senate to the House through the Rotunda. The solemn and orderly process in the Rotunda, depicted in Image 6 below, is a far cry from the chaotic and criminal mayhem White and his fellow rioters wrought in the Rotunda just two hours later, depicted in Image 7. So long as White was in that Rotunda, the joint session, and therefore the transfer of power, could not proceed.



*Image 6:* The Joint Session in the Rotunda on January 6



*Image 7*

White's disdain for the peaceful transfer of power was not limited to his unlawful presence in the Rotunda and Statuary Hall. White intentionally defied clearly posted signs and documented his contempt for Congressional rules.



*Image 8*

At approximately 2:46 p.m., White exited the Capitol Building via the East Front House Door. Again, at this point, White could gone home. Again, he chose not to.

White turned around and re-entered the building a third time. White walked through the Statuary Hall and Rotunda again. At approximately 2:53 p.m., White exited the Capitol building via the Senate Wing Door on the North Side of the Capitol.



*Image 9*

*Defendant's Interview*

On April 11, 2022 and August 23, 2023, White gave voluntary interviews to the FBI. During the interviews, White admitted that a month or two before January 6, 2021, he reached out to the Albany Proud Boys chapter and inquired if any chapters existed in his area. White indicated he was not told of any chapters further north and never joined the group. White stated that his primary interest in the Proud Boys was their survivalist focus rather than any politically motivated group.

White admitted to traveling to the Capitol but stated that he did not attend Donald Trump's rally. White stated that he did not see any barricades as he approached the Capitol Building but once he was within 100 yards of the building, he did feel like he was trespassing. When White observed a massive crowd approaching the Capitol Building, he joined them and climbed through a broken window next to the Senate Wing Door. Once inside, White used gloves to clear off broken glass and helped others climb through the window and pass through items such as coolers, backpacks, and law chairs.

9

White stated that he took photos while inside the Capitol Building. After January 6, 2021, White burned the photos to a disc and buried the disk in his backyard. White then deleted the photographs from his phone. After the August 23, 2023 interview, White turned over the disc containing the photos to the FBI.

*The Charges and Plea Agreement*

On September 13, 2023, the United States charged White by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1), 1752(a)(2) and 40 U.S.C. § § 5104(e)(2)(D), 5104(e)(2)(G). On November 3, 2023, pursuant to a plea agreement, White pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, White agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

White now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, White faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised release up to one year. White must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Probation Office calculated the Sentencing Guidelines offense level in this case as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Chapter Four Adjustment (U.S.S.G. §§4C1.1 | -2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 2 |

*See* PSR at ¶¶ 30-39

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 is now in effect but was not considered at the time the parties entered into the plea agreement.

While the Government concedes that Section 4C1.1 applies to White, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers . Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances.

Many rioters collectively disrupted congressional proceedings and each individual rioter contributed to that disruption. Because White's presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that White in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus White's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. See U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. See, e.g., United States v. Little, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated White's criminal history as a 0 (category I) PSR at ¶43. Accordingly, the U.S. Probation Office calculated White's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶¶ 94. White's plea agreement contains an agreed-upon Guidelines' calculation that differs from

the U.S. Probation Office's calculation because it does not include the § 4C1.1 reduction. The plea agreement, however, reaches the same guideline imprisonment range.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of three months incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing White's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like White, the absence of violent or destructive acts is not a mitigating factor. Had White engaged in such conduct, he would have faced additional criminal charges.

13

In his interview with the FBI, White claimed that he was swept up in the momentum of the crowd and entered the Capitol through a broken window. It is important for the Court to consider this explanation against the evidence that White entered the Capitol Building three separate times, at each point choosing to remain a part of the mob versus returning home to care for his son.

The Court should consider that White's assistance was freely given to members of the mob so they could climb through a broken window and breach the Capitol Building but withheld from the members of the US Capitol Police that White encountered and recognized were overwhelmed.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  White's History and Characteristics
As noted in the PSR, White has no criminal history. White is 53 years old and works as a carpenter.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

14

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs in favor of a sentence of incarceration, though White took steps after January 6 to right his wrongs. He engaged in two voluntary interviews with the FBI and agreed to plead guilty to a misdemeanor offense for his actions. As part of his presentence interview, White stated that he wished he had never been at the Capitol. That said, White's conduct was grave. He entered the Capitol Building within ten minutes of its initial breach, exited and entered the Capitol Building multiple times, and assisted other rioters in entering the Capitol Building. A period of incarceration is warranted to deter such conduct in the future.

15

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence White based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

White has pleaded guilty to Count One of the Information in violation of 18 U.S.C. §1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Liu Jia*, 21-cr-711 (TJK), the defendant pled guilty to a misdemeanor charge of violating 18 U.S.C. 1752(a)(1). Like White, Jia entered the Capitol Building despite obvious signs it was not open to the public, such as climbing through a broken window, left, and

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

then re-entered the Capitol Building. Unlike White, Jia only left the Capitol Building once (versus twice for White) before re-entering and Jia's initial entrance into the Capitol Building was at 3:24 p.m., a full hour after White. After January 6, Jia deleted photos and videos from his phone, did not express remorse for his actions, and was charged with defrauding the Department of Health and Human Services while on bond although he was criminal history category I. Judge Kelly sentenced Jia to four months of incarceration and twelve months of supervised release.

In *United States v. Lawrence Dropkin*, 21-cr-734 (JEB), the defendant pled guilty (without a plea agreement) to a four-count misdemeanor information including 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2). Like White, Dropkin entered the Capitol Building within fifteen minutes of the initial breach through the Senate Wing doors and remained and paraded throughout several sections of the Capitol Building. Unlike White, Dropkin was present in the Capitol Building for an hour compared to White's thirty minutes. Chief Judge Boasberg sentenced Dropkin to thirty days incarceration and twelve months of supervised release.

The government acknowledges that Verden Nalley also pled guilty to a violation of 18 U.S.C. 1752(a)(1). This Court sentenced Nalley to twenty-four months' probation. *United States v. Verden Nalley*, 21-cr-116 (DLF). Like White, Nalley entered the Capitol Building shortly after the first breach and spent around thirty minutes inside the Capitol Building. Unlike White, Nalley did not exit and then re-enter the Capitol Building twice or assist other rioters in entering the Capitol Building.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that White must pay $500 in restitution, which reflects in part the role White played in the riot on January 6.[4] Plea Agreement at ¶ 15. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* White's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 15.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to three months' incarceration, 12 months of supervised release, 100 hours of community service, and $500 in restitution.. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on White's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:      _/s/ *Shalin Nohria*

<div style="margin-left:40%">

Shalin Nohria
Assistant United States Attorney

</div>

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

D.C. Bar No. 1644392
United States Attorney's Office
601 D St. NW, 6.713
Washington, D.C.,
202-344-5763
shalin.nohria@usdoj.gov